Sarah S. Fall, Appellee, v. Edmund W. Fall et al.,
Appellants.*

Filed December 6, 1905.          No. 13,737.

1. **Courts: Jurisdiction.** The court of one state cannot by its decree
directly affect the legal title to lands situated in another state,
but, "if all the parties interested in the land are brought per-
sonally before a court of another state, its decree, establishing
their equities in the land, would be conclusive upon them and
thus in effect determine the title." *Dull v. Blackman*, 169 U. S.
243, 18 Sup. Ct. Rep. 333.

2. **Judgments of Sister States: Federal Provisions.** When the courts
of a sister state having jurisdiction of the parties, and of their
equitable rights in all of the property owned by one or both of
them, by its findings and decree determine those rights, such
decree must, under the provisions of the federal constitution, be
given full faith and credit by the courts of this state.

3. ————: **Divorce: Decree as to Property.** The statute of the state
of Washington, quoted in the opinion, as construed by the courts
of that state, give the courts jurisdiction in the trial of a divorce
case to make distribution between the parties of all of the prop-
erty possessed jointly or severally by the parties upon principles
of general equity, "having regard to the respective merits of the
parties, and to the condition in which they will be left by such
divorce, and to the party through whom the property was ac-
quired." When both parties to the divorce proceedings in that
state have appeared before the court, being a court of general
jurisdiction, and have asked the court to distribute their prop-
erty, including land in this state, and the court by its decree has
done so, its decree is conclusive of the equities of the parties in
the real estate situated in this state.

4. **Possession of land** is notice of equities; and a purchaser of land
from one not in possession takes it subject to the equitable right
of one in possession thereof.

Appeal from the district court for Hamilton county:
Samuel H. Sornborger, Judge. *Affirmed.*

*Hainer & Smith,* for appellants.

*Thomas H. Matters* and *Stark & Grosvenor, contra.*

* Rehearing allowed. See opinion, p. 120, *post.*

SEDGWICK, J.

This controversy relates to a quarter section of land in Hamilton county.  The plaintiff bases her right in the land upon a decree of the superior court of King county in the state of Washington.  In 1876 the plaintiff and Edmund W. Fall intermarried in the state of Indiana. Afterwards they removed to this state and became the owners of the quarter section of land now in controversy. After residing here for some years they removed to the state of Washington, and, being residents there, an action for divorce was begun by the plaintiff's then husband.  In this action she answered, denying that any cause for divorce existed against her, and in her cross-petition she asked that it might be found that she was entitled to a divorce, and that a decree in her favor be rendered accordingly.  The court decreed a divorce in her favor and also by the decree gave her the land in dispute herein.  Under this decree the plaintiff took possession of the land in October, 1895, and has ever since been in the actual possession and occupancy of the land.  Afterwards her former husband, the said Edmund W. Fall, conveyed the land in question to the defendant Elizabeth Eastin.  The plaintiff brought this action; setting out a full statement of the rights which she claimed in the land and the facts which she claimed supported these rights, and prayed, among other things, that her title in the land be quieted and "for all other proper and equitable relief."  Much is said in the pleadings and evidence in regard to the conveyance from Edmund W. Fall to the defendant Elizabeth Eastin, who is his sister, it being claimed, upon the one side, that the land was purchased by Mrs. Eastin in good faith and for full consideration, and, on the other, that the sale was fraudulent.  But as Mrs. Fall took possession of the land under the decree before the conveyance to Mrs. Eastin, the latter would, of course, be charged with constructive notice of the rights of the plaintiff, and, as against the plaintiff, would take no

further or greater rights than those of her grantor in the conveyance. We will first inquire as to the effect of the decree, and the rights, if any, that the plaintiff took thereunder in the land in question.

1. At the time the divorce proceedings were pending in the state of Washington, and when the decree was rendered therein, the statute of that state provided: "In granting a divorce, the court shall also make such disposition of the property of the parties as shall appear just and equitable, having regard to the respective merits of the parties, and to the condition in which they will be left by such divorce, and to the party through whom the property was acquired, and to the burdens imposed upon it for the benefit of the children, and shall make provision for the guardianship, custody, and support and education of the minor children of such marriage." 2 Codes & St. sec. 5723, p. 1598. It is contended that the decree entered in pursuance of this statute in the state of Washington could have no extraterritorial effect upon real estate situated in another state, or the rights of the parties therein, and this appears to be the gist of the whole contention between the parties. It is clear that the statute in question gives to the court in divorce proceedings complete equitable jurisdiction over the property of the parties situated within the state. The language is apt and pertinent for that purpose. A court that makes a just and equitable disposition of the property of parties litigant in an action is a court of equity and the distribution of the property is, at least in part, the subject matter of the litigation. If, indeed, there could be any doubt in other jurisdictions as to the intention of the legislature in enacting this law, and the force and effect thereof in conferring equitable powers upon the trial court, that doubt has been resolved by the supreme court of that state. In *Webster v. Webster,* 2 Wash. 417, the court, in construing this statute, said:

"This statute, however, provides that when coverture is to be broken, and the marriage relation dissolved, the

parties shall bring into court all their property, and a complete showing must be made. Each party must lay down before the chancellor all that he or she has, and, after an examination into the whole case, he makes an equitable division. * * * We are clearly of the opinion that par. 2007 of the code confers upon the court the power, in its discretion, to make a division of the separate property of the wife or husband."

And, indeed, the parties themselves so considered it. The plaintiff in that case set out a description of the land here in Nebraska, with other property owned by the parties, alleged its value, and asked the court to make an equitable disposition of it under this statute; and the plaintiff here, who was the defendant in that action, also in her cross-petition described this land, and asked the court to determine the rights of the parties to all the property which they owned, including this land in question. The findings and decree of that court were full and covered all of the issues in the case presented by the pleadings, and adjudged the issues so determined in favor of the defendant in that action, who is the plaintiff here. It may be further observed that in that case it was alleged in her cross-petition, by this plaintiff, that the parties to that action had, by their joint efforts as husband and wife, accumulated the property which they held, including the land in question here; and the court especially found that that allegation of her cross-petition was true, and that the property which Mr. Fall had already used for his personal benefit, together with that given him by the decree, was his equitable part of all the property of both parties. The same allegations are embraced in the petition in this case, and the trial court found especially that they were true, and that the plaintiff had contributed equally to the accumulation of the property, including this land in dispute. The findings of fact of the trial court in this case are also quite comprehensive. These findings were not questioned in the oral arguments, nor do the briefs point us to any fail-

ure of the evidence to support them. We will, therefore, in the further consideration of the case, consider these findings as the established facts in the case.

Giving full faith and credit to the decree of the Washington court, as the federal constitution requires us to do, the question is what rights in the land in question the plaintiff derives from that decree. It is suggested in the brief that, "on a cause of action which is purely local, a judgment respecting property that is not within the jurisdiction of the court rendering the judgment should not be enforced by the courts of another state where the property is situated." In pursuance of this argument a quotation is made from 2 Black, Judgments, sec. 933, where it is said that, if a judgment in an action for divorce goes further than to determine the status of the parties, and assumes to adjudicate other matters, no personal liability can be imposed on the defendant, "unless there is jurisdiction of his person acquired by a proper service of process." We do not quite understand why this argument is made. In this case the defendant here was the plaintiff in the divorce proceedings and, of course, there could be no question of jurisdiction of his person.

It is contended in the briefs that the decree of the Washington court and the proceedings afterwards had in that court pursuant to the decree did not and could not have the extraterritorial effect to transfer any title, either legal or equitable, in the land situated in this state to the plaintiff in this action, and that she cannot maintain this action without such title. The foundation for this contention is that, under our statute, in an action to quiet title the plaintiff must allege and establish on the trial either a legal or equitable title. It is essential that "he have title, and the relief must be obtained on the strength of his own title, and not on the weakness of his adversary's." But this suggestion, of course, assumes the proposition that is being discussed. The question under consideration is whether the plaintiff obtained any title, either legal or equitable, in this land by virtue of that decree.

Thus, in *Blodgett v. McMurtry*, 39 Neb. 210, one of the cases cited by the defendant upon this question, it is said:

"In an action having for its object the declaration of a trust in land in favor of the plaintiff and the quieting of title in him, it is incumbent upon the plaintiff to affirmatively establish an equitable title in himself, and if he fail to do so, the nature of defendant's title or the existence of any title in defendant, is immaterial."

By the statutes of this state the court in a divorce proceeding has no power to set apart real estate to either party or to make any equitable division of the real estate of the respective parties. And it is urged in the brief that our courts would not be competent to render such a decree as was rendered by the superior court of Washington, and from this fact it is argued that by the decree in the court below an effect was given to a judgment of a sister state which no court in this state could have rendered. But in our state the courts may in divorce proceedings adjust the equitable rights of parties in property, if such equitable rights exist, and judgments for alimony in divorce cases become liens upon real estate of the party against whom they were entered, and by a sale under such lien the title to the real estate is transferred. The question therefore raised by the foregoing suggestion is one of practice rather than one of substantive law. The methods provided by the law of Washington for adjusting the rights of the parties to a divorce proceeding cannot be said to be in conflict with the general policy of the laws of this state. On the other hand, the results aimed at are, in substance, the same, the intention in both states being to give each party a fair share of the property which they have accumulated in common. The superior court of Washington is a court of general jurisdiction. It has full power to settle all equities of the parties, and by the statutes of that state it was confided to the court to make an equitable adjustment and distribution between the parties of all the property owned by them both, or, in the language of the

court of last resort in that state, it is the duty of the parties to an action for a divorce to bring into court all their property. "Each party must lay down before the chancellor all that he or she has, and, after an examination of the whole case he makes an equitable division." No clearer language than this could be used to indicate that the divorce courts there have general equity jurisdiction over the property and property rights of the parties, and that the decree of the court in such a case is a decree in equity as to the property of the parties, and fixes and disposes of their property rights in the same manner as do decrees in equity in courts of general jurisdiction in actions brought for the purpose of determining the equities of the parties in specific property. It cannot, of course, be doubted that, if by the law of the state where the parties reside one of the parties is given equity in property, and, in a proper case for that purpose, the courts of that state find and adjudicate that right to exist, the courts of another state will not refuse to recognize that decree, and give the full faith and credit, solely on the ground that under its laws the equitable rights of the parties could not have been adjudicated in the form of action used in the court rendering the decree. We see no reason why the rules that obtain in the adjudication and adjustment of partnership rights would not be applied here. In an action in equity to settle partnership affairs the property of the partnership is considered to be in court for the purpose of the full adjustment of the rights of the partners in the property; and so here, the law required that all of the property of the parties to the divorce proceedings be brought into court, so that the court might do what the statute required it to do—"make such disposition of the property of the parties as shall appear just and equitable"—and when the parties have by their pleadings so brought the property into court, we see no reason why the force and effect of the decree should not be as full and complete as in

similar proceedings for the adjustment of partnership rights and equities.

In *Burnley v. Stevenson*, 24 Ohio St. 474, the court declared the rule to be:

"A court of equity in one state, having acquired jurisdiction over the persons of the parties, may enforce a trust, or the specific performance of a contract, in relation to land situate in another state. Although the decree in such case, or the deed of a master executed in pursuance thereof, cannot operate to transfer the title to such lands, yet the decree is binding upon the consciences of the parties, and concludes them in respect to all matters and things properly adjudicated and determined by the court. When the decree in such case finds and determines the equities of the parties in respect to such land, and directs a conveyance by the parties in accordance with their equities, such decree, although no conveyance has been executed, may be pleaded as a cause of action, or as a ground of defense in the courts of the state where the land is situated; and it is entitled, in the court where so pleaded, to the force and effect of record evidence of the equities therein determined, unless it be impeached for fraud."

In an action for that purpose in the courts of Kentucky, a judgment was entered, decreeing the specific performance of a contract to convey lands in Ohio. Parties who derived title from the plaintiff, who obtained the decree in the Kentucky court, set up that decree as a defense in an action in Ohio brought to recover possession of the land in the latter state. The defense was sustained. The court said:

"That courts exercising chancery powers in one state have jurisdiction to enforce a trust, and to compel the specific performance of a contract in relation to lands situate in another state after having obtained jurisdiction of the persons of those upon whom the obligation rests, is a doctrine fully settled by numerous decisions."

Counsel for the defendant in their brief quote at length

from the statement of facts in the opinion in this case, and then say: "This statement of facts clearly shows that the action in the state of Kentucky was based upon the contract to convey by Scott, the ancestor of plaintiffs. When a suit is instituted upon a contract and the court acquires jurisdiction of all the parties to be affected thereby, its judgment is a legal construction of that contract and will bind the parties. Such construction, which becomes a part of the contract, can be plead as the true and legal construction, although a suit thereon be instituted in a foreign jurisdiction." But such judgment of the court not only affects, but necessarily determines the rights of the parties to the land lying in another state; so that it is not correct to say that no judgment of a court of one state can affect the rights of the parties in real estate lying in another state. Again, if the courts of one state have jurisdiction to affect and virtually determine the equitable rights of parties in real estate lying in another state by construing the contracts of the parties in relation thereto, that is, by determining what equities between the parties their contracts have raised, why may they not also determine what equities between the parties the law and their respective contributions to accumulating the property, and their conduct toward each other have raised? Counsel say that "such construction, which becomes a part of the contract, can be plead as the true and legal construction, although a suit thereon be instituted in a foreign jurisdiction." That is to say, in a suit in one state to establish equities in land and to quiet title thereto, the plaintiff may plead the judgment of the courts of another state determining what his rights in the land are, if those rights arise from a contract; and such judgment is conclusive, it will not admit of contradiction. But if the rights of the plaintiff depend upon equitable considerations arising from the relation and the condition of the parties, and the amounts they have respectively contributed toward its purchase, such judgment has no binding force. This distinction seems not

to be based upon any difference in principle. The Washington court, as has already been suggested, by the law of that state, had undoubted jurisdiction of all of the equities of the parties, and it was expressly made the duty of the court, by the law of the state, upon separating the parties, to adjust and declare what their equitable rights were in all of the property which they both possessed. We do not see why its judgment upon these issues should not have the same force in determining the rights of the parties to real estate situated in another state, as though those rights originated in an express contract between them.

In *Pingree v. Coffin,* 12 Gray (Mass.), 288, 304, the court said:

"The fact of the *situs* of the land being without the commonwealth does not exempt the defendants from jurisdiction, the subject of the suit being the contract, and a court of equity dealing with persons, and compelling them to execute its decrees and transfer property within their control, whatever may be the *situs*. These defendants having been found within the jurisdiction of the court, and served with its process, and having appeared and answered originally without objection to the jurisdiction, will not be presumed to be without its jurisdiction so that its decrees cannot be executed. If such event should occur, it will be time to determine what remedies the plaintiff might have. But it seems that their personal property within the commonwealth might be sequestered. 2 Daniel, Chancery Practice, 1236, 1237. The court might retain the bill, and, under the general prayer for relief, mould the decree to one of damages for nonconveyance. *Andrews v. Brown,* 3 Cush. 136; *Peabody v. Tarbell,* 2 Cush. 226. And a decree of this court might be a foundation for other courts to compel performance specifically."

In the state of Washington, in an action to dissolve marriage, the subject of litigation is the marriage status, and the equitable rights of the parties in the property of both upon their separation, and so, the action being *in*

*personam,* a decree of that court in such action "might be a foundation for other courts to compel performance specifically."

*Dull v. Blackman,* 169 U. S. 243, 18 Sup. Ct. Rep. 333, was an action brought in Iowa to compel reconveyance of real estate situated in that state on the ground of the defendant's failure to advance money thereon as agreed. A defense set up in the action by an amended answer was that a judgment had been recovered in the state of New York in an action involving the same question and between the same parties. The validity of this defense was denied upon two grounds, as shown in the opinion of Mr. Justice Brewer, as follows:

"Upon these facts we remark that as the land, the subject matter of this controversy, was situate in Iowa, litigation in respect to its title belonged properly to the courts within that state, *Ellenwood v. Marietta Chair Co.,* 158 U. S. 105, 107, although, if all the parties interested in the land were brought personally before a court of another state, its decree would be conclusive upon them and thus, in effect, determine the title."

The other reason given was that the defendant in the Iowa case, who held the title to the land, although he obtained his title from a party to the New York decree, was not in privity with him because he obtained his title before the commencement of the New York action. It is said in the syllabus:

"A grantee of lands is not bound by a judgment rendered in an action commenced against his grantor subsequent to the conveyance."

From which it appears that, if the New York action had been begun before the conveyance of the Iowa land to the defendant and he had been a party to the New York decree, he would have been bound by that judgment, and would have been compelled by the Iowa court to convey the land.

In the defendant's brief we are earnestly requested to carefully consider *Bell v. Bell,* 181 U. S. 175, 21 Sup. Ct. Rep. 551; *Streitwolf v. Streitwolf,* 181 U. S. 179, 21 Sup.

Ct. Rep. 553; and *Andrews v. Andrews*, 188 U. S. 14, 23
Sup. Ct. Rep. 237.   In *Bell v. Bell*, it is held that "no valid
divorce from the bond of matrimony can be decreed on
constructive service by the courts of a state in which
neither party is domiciled."   The recital in proceedings for
divorce of the facts necessary to give jurisdiction may be
contradicted in a suit between the same parties in another
state.   The other cases mentioned are similar to this.
The point, however, relied upon in these cases, we suppose,
is to be derived from the opinion, in which it is held that
an action for divorce, that is, to dissolve the marriage
status between the parties, is a local action, and that
no court has jurisdiction to dissolve the marriage status,
except the court of the domicile of the parties, or one of
them.   We do not see how this proposition has any bear-
ing upon the question involved here.   Both of these par-
ties were domiciled in the state of Washington at the time
of the divorce proceedings, so that the courts of that
state had jurisdiction of their marriage relation, and, by
the laws of that state, that court was also given the
further jurisdiction to determine and adjust the equities
of the parties in the property of both.

Again, it is sought to draw an argument from the lan-
guage used in the decree of the Washington court.   It
was adjudicated that the land in question "be, and the
same hereby is, set apart to the defendant Sarah S. Fall
as her own separate property, forever, free and unincum-
bered from any claim of the plaintiff thereto."   The law
required the court to determine the equitable rights of
the parties in all of their property, and it is possible that
language might be selected to more nearly correspond
with the requirements of their law in that regard.   The
court found that the defendant therein, Sarah S. Fall,
"is entitled to a decree of this court setting apart to
her as her own separate property, forever,   *   *   *   a
certain tract of real estate, to wit" (describing the land
in question), and the language of the decree is sufficient,
as far as formalities are concerned, to adjudicate her

equities in the land. The defendant asks in his brief: "Was the title to the land in question at issue in the divorce suit, and did that court possess jurisdiction to determine the question of title? We think it should rather be said that the right to the land was in issue, and the equitable right to have title, rather than the legal title itself.

Our attention is also called to *Kline v. Kline,* 57 Ia. 386, 42 Am. Rep. 47. In that case the wife and children were residing in Iowa, the husband was a resident of Wisconsin and there obtained a divorce from his wife upon the ground of desertion. The service was by publication only. The wife had no notice nor actual knowledge of the legal proceedings. The decree of the Wisconsin court gave the husband the custody of the children. The supreme court of Iowa refused to enforce this decree. Its reason is stated in a quotation which the court makes from *Woodworth v. Spring,* 4 Allen (Mass.), 321:

"Every sovereignty exercises the right of determining the *status* or condition of persons found within its jurisdiction. The laws of a foreign state cannot be permitted to intervene to affect the personal rights or privileges even of their own citizens, while they are residing on the territory and within the jurisdiction of an independent government. * * * The question whether a person within the jurisdiction of a state can be removed therefrom depends, not on the laws of the place whence he came or in which he may have his legal domicile, but on his rights and obligations as they are fixed and determined by the laws of the state or country in which he is found."

If the law of Wisconsin had given their courts jurisdiction in a divorce proceeding to determine the custody of the children, and if both parties had there appeared and submitted themselves to the jurisdiction of the court, and had asked the court to determine to which party the custody of the children should be given, the Iowa court might still have refused to banish the children from its

Fall v. Fall.

state because of the personal rights of the children them-selves; but the case would have been very different from the one presented to and determined by the Iowa court.

The case of *Bullock v. Bullock,* 52 N. J. Eq. 561, 30 Atl. 676, is much relied upon by the defendant. Indeed, this is the only case to which our attention has been drawn which conflicts in some degree at least with the con-clusion which we have reached. The opinion of the court as announced by Magie, J., appears to contain language which in its literal meaning supports the contention of the defendant. The wife had obtained a divorce in the state of New York, with a decree for permanent alimony, and also decreeing that the husband should execute a mortgage upon land situated in the state of New Jersey to secure the payment of the alimony. An action was brought in the state of New Jersey to compel the specific performance of this decree by executing the mortgage upon the lands in that state. The court held that such a decree would not be enforced in the state of New Jer-sey. In the opinion it is stated that the petition alleged that the action commenced in New York was for the purpose of dissolving the marriage of the parties, and alleged that the court had jurisdiction of the case. The writer of the opinion said:

"I find difficulty in determining how extensive a juris-diction is thereby asserted to have inhered in the supreme court of New York.  *  *  *  From these statements it was obviously to be assumed that the court in ques-tion had jurisdiction to decree a divorce and annul a marriage. But is it to be inferred—for there is no ex-press averment of it—that the same court possessed juris-diction to fix the amount and require payment of alimony, and especially to require a defendant to secure the pay-ment of alimony by a charge upon lands lying beyond the territorial jurisdiction of the court? Alimony is, in general, an incident of divorce. It may be justifiable to infer that a court empowered to dissolve the bonds of matrimony would also be clothed with authority to

determine on the amount of alimony and to render judg-
ment therefor. But how, without some further averment,
is an inference to be drawn that the same court was
authorized to require security for the payment of ali-
mony to be given by the mortgage of lands and of lands
beyond its jurisdiction?"

One member of the court concurs in the conclusion
solely upon the ground expressed in the above quotation,
and five members of the court refused to agree to the
conclusion reached, so that the language of the remainder
of the opinion, which one member of the court, at least,
who concurred in the conclusion, thought unnecessary to
the determination of the case, and from which five mem-
bers of the court dissent, is not to be regarded as au-
thority of a controlling nature. Van Syckel, J., in his
dissenting opinion said:

"The New York court having jurisdiction of the per-
son of the husband and also of the subject matter of
the suit there, the judgment in that state, as between
the parties to that suit, was conclusive of the right of the
wife to have the husband execute a mortgage upon the
New Jersey lands, although it did not of its own force
create a lien upon the lands. As to the title to such
lands, it had the effect of an admitted legal contract
or obligation by the husband to convey and should be
enforced in equity here. A judgment in New York that
a party defendant shall specifically perform a written
contract to convey lands in New Jersey would furnish
no better foundation for the interference of our court of
equity than the judgment relied upon in this case. In
what respect they differ in principle is not apparent. In
either case obedience to the mandate of the federal con-
stitution would give effect to the judgment here."

The reasoning of the minority opinion is more satis-
factory to our minds, and we think is in harmony with
the better authorities. It may further be observed that
this case is distinguishable from the one at bar. This

Fall v. Fall.

will be observed from a consideration of the concurring opinion of Mr. Justice Garrison, who said:

"That only is *judgment* that is pronounced between the parties to the action upon the matters submitted to the court for decision. To judgments thus rendered, the federal law accords in every state the same conclusive force possessed in the state where they are rendered. After judgment in a state court, all that follows for the purpose of enabling the successful party to reap the benefits of the determination in his favor is execution or in aid of execution. No interpretation has ever been placed upon the federal constitution giving conclusive effect, or, indeed, any effect at all to the executions of the judgments rendered in sister states or to any order merely in aid thereof."

This view appears to have been unanimously taken by the chancery court when the case was there considered. 51 N. J. Eq. 444, 27 Atl. 435. In the case at bar it seems that the Washington judgment was "pronounced between the parties to the action upon the matters submitted to the court for decision." Under such circumstances Mr. Justice Garrison, at least, would not have concurred in the conclusion reached in *Bullock v. Bullock, supra.* In that case there was a judgment for the payment of alimony and a decree that it should be secured. It was this decree that was sought to be enforced in another state. The providing for the collection of the amount of alimony due under the decree was thought to be in the nature of an execution, or in aid thereof, that is, a part of the remedy, which is always provided by the state in which it is to be used. In the case at bar the judgment was not for alimony. Alimony is decreed for the necessary support of the wife. This land was decreed to her, not because she needed it, but because she was entitled to it, not necessarily for the purpose of her support, but because the equities arising out of her marriage relation under the laws of Washington, and the conduct of her husband toward her, and her personal

contributions toward the accumulation of the property, entitled her to this land, and the law required the court to consider, determine and adjust her equities.

The decree of the Washington court determined that it is "just and equitable" that this plaintiff have the land. That was a proper issue to be presented under the law. The court had jurisdiction of the matter and of the parties. If we give "full faith and credit" to that decree, we must affirm the judgment of the lower court.

AFFIRMED.

BARNES, J., dissenting.

I am unable to concur in the foregoing opinion. Conceding that the superior court of the state of Washington had jurisdiction of the parties and power to render the decree which it pronounced between the plaintiff and her former husband, Edmund W. Fall, still that decree had no extraterritorial force and could not create or affect the title to lands situated in Nebraska. And while such decree is no doubt binding upon the conscience of each of the parties thereto it does not give the plaintiff such an interest in the land in controversy as amounts to a title and which will serve as a basis to quiet the same. It does not seem to me that the clause of the federal constitution which provides that we shall give full faith and credit to the judgments and decrees of the courts of our sister states, requires us to give such judgments more force or a greater effect than they would have had if rendered by the courts of our own state.

The following opinion on rehearing was filed July 12, 1907. *Reversed with directions.*

1. **Courts:** JURISDICTION. A court of chancery has power, in a proper case, to compel a conveyance of land situated in another country or state, when the persons of the parties interested are within the jurisdiction of the court.

2. **Decree:** EFFECT AS CONVEYANCE. If no action is taken by the person ordered so to do, either voluntarily or involuntarily, to con-

vey the land, as directed, neither the decree nor the order to convey can in any manner affect title to lands in another state.

3. ——: LANDS IN ANOTHER STATE. A decree and order to convey in such a case can act only upon the person and cannot affect the title to the land. It imposes a mere personal obligation enforceable by the usual weapons of a court of chancery.

4. Judgments of Sister States: FEDERAL PROVISIONS: JURISDICTION. The clause of the constitution of the United States requiring full faith and credit to be given in each state to the public acts, records and judicial proceedings of every other state does not prevent the courts of this state from examining the records of the courts of a sister state to ascertain whether or not that court had jurisdiction of the subject matter.

LETTON, J.

This is an action to quiet the title to an undivided one-half interest in a certain tract of land in Hamilton county, and to cancel and annul a certain mortgage and deed executed by the defendant, E. W. Fall, to the defendants W. H. Fall and Elizabeth Eastin. The plaintiff, Sarah S. Fall, bases her right to the relief prayed upon a decree rendered in divorce proceedings in the state of Washington, whereby a court of that state set apart the premises to her as her separate property and ordered her former husband, E. W. Fall, to convey the same to her.

In 1876 E. W. Fall and Sarah Fall were married in Indiana. They afterwards removed to Hamilton county, Nebraska, and lived in Nebraska until 1889, when they removed to the state of Washington. In 1879, while they lived in Nebraska, E. W. Fall purchased 160 acres of land in Hamilton county, the title to the undivided one-half of which is in controversy. In 1887 he conveyed the farm to Mrs. Fall's brother, as an intermediary, who in turn reconveyed to E. W. Fall and Sarah S. Fall, thereby vesting each with an undivided one-half interest in the land.

E. W. Fall began an action for divorce against his wife in February, 1895, in the superior court of King county,

Washington, to which she filed an answer and cross-petition. The law of Washington required parties desiring a divorce to bring into court a list and description of all their property, and empowers the judge of the court, sitting as a chancellor, to make an equitable division of all the property between the parties. See former opinion, *ante*, p. 104. The husband in his petition claimed the Nebraska land as his own property, while the wife asserted the same to be community property belonging to them both, and asked the court to set it apart to her as her separate property. On October 5, 1895, by its decree, the Washington court refused a divorce to the husband, and granted it to the wife on her cross-petition, and set apart and gave the Nebraska land to the wife as her sole and separate property, and directed the husband to convey the land to the wife in five days, which he refused and neglected to do. An appeal bond was filed, and the cause was taken to the supreme court of Washington by Mr. Fall, but on May 15, 1896, the appeal was dismissed. On May 24, 1895, E. W. Fall executed an indemnity mortgage to his brother, the defendant W. H. Fall, a resident of Nebraska, as defendants allege, to secure him from loss by reason of his having signed a note of $1,000 as surety for E. W. Fall in September, 1893, for money borrowed from his sister, Elizabeth Eastin. This mortgage was recorded on January 10, 1896. On July 3, 1896, without notice to E. W. Fall, the Washington court appointed one W. T. Scott as commissioner for the purpose, who executed a deed of E. W. Fall's undivided half interest in the Hamilton county land to Sarah S. Fall. This instrument was approved by the judge of the superior court, filed in the office of its clerk, and afterwards recorded in Hamilton county, Nebraska. At the time of these various conveyances the land was in the actual possession of a tenant of E. W. Fall and Sarah S. Fall, but this tenant attorned to Sarah S. Fall, who has held possession ever since. On April 27, 1896, and while the appeal was pending, E. W. Fall, who in the meantime had become a resident of Cali-

Fall v. Fall.

fornia, executed a warranty deed to Mrs. Eastin for his undivided one-half interest in the land in payment of the same debt. At the time of the divorce and conveyances the land was incumbered, and Fall's interest was apparently worth no more than the amount of the debt.

In 1897 Sarah S. Fall began this action in the district court for Hamilton county, Nebraska, setting up the proceedings and decree in the state of Washington, the execution of the deed to her by Scott, commissioner, the execution and recording of the mortgage to W. H. Fall and the deed to Mrs. Eastin, and alleging that the mortgage and deed were each made without consideration and for the purpose of defrauding her, and that the mortgage and deed cast a cloud upon her title to the land acquired by virtue of the decree and commissioner's deed, and praying that the title to the land be quieted in her, and the deed and mortgage declared null and void. Personal service was had upon W. H. Fall, who disclaimed any interest in the premises and executed a release of the mortgage made to him by E. W. Fall. Constructive service was sought to be had upon Mrs. Eastin and E. W. Fall by publication, which service was defective as to Mrs. Eastin. This fact not appearing at the time, and default being made, a decree was entered on September 23, 1897, in favor of Mrs. Fall in accordance with the prayer of her petition. Within five years thereafter, upon Mrs. Eastin's application, this default judgment was opened under the statutory provisions and she was allowed to defend. Mrs. Eastin filed an answer, which pleads, in substance, that the petition does not state a cause of action; and in addition thereto sets forth her loan of $1,000 to E. W. Fall, the taking of the note signed by E. W. and W. H. Fall therefor, the giving of the indemnity mortgage to W. H. Fall and the subsequent execution of the deed by E. W. Fall to her in satisfaction of the debt. She further alleged the *bona fides* of the transaction, and denied the remaining allegations of the petition. No appearance was made by E. W. Fall and no personal service was had upon him. Trial was had,

the issues found in favor of the plaintiff, Sarah S. Fall, and a decree rendered accordingly. The case is now before us upon appeal by Mrs. Eastin from this judgment of the district court.

The contentions of the appellant, in substance, are: That the decree of the Washington court and the deed executed by the commissioner of said court to Mrs. Sarah S. Fall are absolute nullities in so far as they relate to the land in Nebraska; that Mrs. Fall has no such title or interest in the undivided half interest in the land which had belonged to E. W. Fall that she can maintain this action; that, conceding that the Washington court had the power to compel the execution of the conveyance by E. W. Fall while he was within its jurisdiction, still since its decree acted only upon the person and not upon the land, and since no action was taken or compelled toward conveying the title to Mrs. Fall, she never acquired any interest in or title to the real estate in this state, and the decree of the Washington court utterly failed to affect the land, or to bind or fetter any action taken by E. W. Fall after he passed beyond the jurisdiction of that court. She further contends that by the laws of this state the courts of Nebraska are not permitted, by a decree in a divorce proceeding, to take the title of real estate from the husband and vest it in the wife, by way of adjusting the equities of the parties in the property of the husband, and that such a proceeding would be in violation of the law and public policy of this state. Upon the other hand, the appellee, Mrs. Fall, contends that the decree of the Washington court in the proceedings for divorce and for a division of the property fixed the equities and bound the conscience of the parties, and created a personal legal contract of record on the part of E. W. Fall to make a conveyance of his interest in the land, which he could not escape by going beyond the jurisdiction of the Washington court, and that the decree is entitled to the same faith and credit in the courts of this state that it has in the courts of Washington; that Mrs. Fall's rights in and to the land, acquired by virtue of the

Fall v. Fall.

decree, are sufficient to enable her to maintain an action in this state for the purpose of quieting her title to the land; that the decree of the Washington court bound E. W. Fall to such an extent that neither he nor his privies could afterwards set up any right or title in the Nebraska lands against her, and that Mrs. Eastin acquired no right, title or interest in the land by virtue of the deed from E. W. Fall or the mortgage to W. H. Fall, and that the same were fraudulently made.

If the Washington court had taken the value of the Nebraska land into consideration in fixing the rights of the parties and rendered a money judgment accordingly, such a judgment might be enforced here under the full faith and credit clause of the United States constitution, since the court had full power and jurisdiction to render the same. *Barber v. Barber,* 21 How. (U. S.) 582, 16 L. ed. 226; *Trowbridge v. Spinning,* 23 Wash. 48, 62 Pac. 125. And this has been the usual method in such cases. 2 Bishop, Marriage, Divorce and Separation, sec. 1,123. But what power had the Washington court to affect the title to the land or to confer equities therein by its decree? The purpose of the statutes of Washington referred to evidently was to give to the courts of that state powers with reference to the ascertainment of the duties of the parties with reference to property, growing out of the marriage relation, of the same nature as those which are enjoyed by courts generally having jurisdiction over divorce, alimony and the custody and support of children, but greater in extent than those enjoyed by the courts of some states. This power was unknown to the unwritten law, and when no statute exists the courts do not possess it. 2 Bishop, Marriage, Divorce and Separation, sec. 1,119. The power thus given is to be exercised in connection with the proceedings concerning the marriage status, ibid. sec. 826. It is remedial and ancillary to the divorce proceedings, and not independent. In that state the same marital duties, which are enforced here by way of alimony, may be enforced by the compulsory division of real estate be-

longing to either spouse.' This division of property is
not based upon the view that the innocent party has an
equitable interest in the property itself, but upon the fact
that it is the duty of a husband to provide for, support and
maintain his wife in such manner as suits and accords
with his pecuniary circumstances and station in life, so
that she, being innocent, shall not suffer from his fault.
It is of the same nature as that exercised by the courts of
Nebraska in awarding permanent alimony.   In such case
it is the duty of the court to consider the condition, situa-
tion and standing of the parties, financial and otherwise,
the duration of the marriage, the amount and value of the
husband's estate, the source from which it came, and the
necessity for the support and education of children.   It
is a method of enforcing the duty of support and main-
tenance.   *Fischli v. Fischli,* 1 Blackf. (Ind.) 360, 12 Am.
Dec. 251; *Shafer v. Shafer,* 10 Neb. 468; *Cochran v. Coch-
ran,* 42 Neb. 612; *Zimmerman v. Zimmerman,* 59 Neb. 80;
*Smith v. Smith,* 60 Neb. 273.

It is well established that a court of chancery, in a
proper case, has power to compel a conveyance of lands
situated in another country or state, where the persons of
the parties interested are within the jurisdiction of the
court.   It is said by Justice Story: "The ground of this
jurisdiction is that courts of equity have authority to act
upon the person: *'Æquitas agit in personam.'* And al-
though they cannot bind the land itself by their decree, yet
they can bind the conscience of the party in regard to the
land, and compel him to perform his agreement according
to conscience and good faith."   2 Story, Equity Juris-
prudence (13th ed.) sec. 743; 3 Pomeroy, Equity Juris-
prudence (2d ed.) sec. 1,318.   The leading case upon this
doctrine in England is *Penn v. Lord Baltimore,* 1 Ves.,
Sr., (Eng.) 444, in which the chancellor of England de-
creed a specific performance of a contract respecting lands
lying in North America.   This case was followed in
*Massie v. Watts,* 6 Cranch (U. S.), 148, in a learned opin-
ion by Chief Justice Marshall, who examined and reviewed

the cases prior to *Penn v. Lord Baltimore*, and announced the rule as follows:

"Upon the authority of these cases, and of others which are to be found in the books, as well as upon general principles, this court is of opinion, that, in a case of fraud, or trust, or of contract, the jurisdiction of a court of chancery is sustainable, wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree."

This case settled the law upon this point, and its principal doctrine has ever since been recognized and enforced by the courts of chancery in this country. But, says Judge Story:

"Still it must be borne in mind that the doctrine is not without limitations and qualifications; and that to justify the exercise of the jurisdiction in cases touching lands in a foreign country the relief sought must be of such a nature as the court is capable of administering in the given case. We have already seen that a bill for a partition of lands in a foreign country will not be entertained in a court of equity, upon the ground that the relief cannot be given by issuing a commission to such foreign country. Perhaps a more general reason might be given, founded upon the principles of international law; and that is, that real estate cannot be transferred or partitioned or charged, except according to the laws of the country in which it is situated." 2 Story, Equity Jurisprudence (13th ed.), sec. 1,298.

It is conceded by the appellee that the decree of the Washington court has no force and effect on the title to property here, but it is contended, mainly upon the authority of *Burnley v. Stevenson*, 24 Ohio St. 474, that, though the decree of the court of Washington could not affect the title to land in this state, yet, when this decree is pleaded in the Nebraska court as a cause of action, it must be regarded as conclusive of all the rights and equities which were adjudicated and settled in the divorce case. A number of cases have been cited in which it is said this princi-

ple is upheld, but we have yet been unable to find a single case in which the direct question at issue was whether or not a decree affecting the title to real estate lying in another state will be recognized in the state in which the land lies, where no conveyance has been made in obedience to the decree, and where the title has been conveyed to third parties. It is true that in *Cheever v. Wilson*, 9 Wall. (U. S.) 108, and in *Dull v. Blackman*, 169 U. S. 243, 18 Sup. Ct. Rep. 333, there are certain *obiter* expressions which are quoted in support of such doctrine, but in these cases this question was not before the court for decision, in *Cheever v. Wilson* an instrument having been executed in performance of the decree, and in *Dull v. Blackman* the case was decided upon another point. We think there can be no doubt that, where a court of chancery has by its decree ordered and directed persons properly within its jurisdiction to do or refrain from doing a certain act, it may compel obedience to this decree by appropriate proceedings, and that any action taken by reason of such compulsion is valid and effectual, wherever it may be assailed. In the instant case, if Fall had obeyed the order of the Washington court and made a deed of conveyance to his wife of the Nebraska land, even under the threat of contempt proceedings, or after duress by imprisonment, the title thereby conveyed to Mrs. Fall would have been of equal weight and dignity with that which he himself possessed at the time of the execution of the deed. *Gilliland v. Inabnit*, 92 Ia. 46, was a case of this kind, where the controversy was between the plaintiff, who was the grantee in a conveyance of land in Iowa, which had been compelled by a Kentucky court, and the heirs of her grantor. The Iowa court held that the decree of the Kentucky court established the trust, and that the conveyance made in consequence of such decree was valid and effectual to convey the Iowa land, even though made by compulsion and by imprisonment of the grantor.

It is said by Mr. Freeman in an exhaustive note to *Newton v. Bronson*, 67 Am. Dec. 89 (13 N. Y. 587). "From

the very nature of the property, land must be governed by the *lex loci rei sitæ*. No judgment of a court of another jurisdiction can have any effect upon the title to the property. And the power of equity in decreeing the conveyance of land is effectual only upon the person, not upon the land. The decree does not change the title to the land. It remains the same as before until the person in whom the title resides either voluntarily or perforce obeys the decree of the court and divests himself of the title by a conveyance valid under the *lex loci*. The decree of chancery, then, with respect to realty beyond its jurisdiction, can have no direct operation upon the property, and *per se* in no way affect the legal or equitable title thereto. *Carrington's Heirs v. Brents,* 1 McLean (U. S.), 167; *Massie v. Watts,* 6 Cranch (U. S.), 148; *Hawley v. James,* 7 Paige Ch. (N. Y.) 213, 32 Am. Dec. 623; *Proctor v. Ferebee,* 1 Ired. Eq. (N. Car.) 143." See also *Cooley v. Scarlett,* 38 Ill. 316; Westlake, Private International Law, 64. *Proctor v. Proctor,* 215 Ill. 275, 69 L. R. A. 673, and note.

In *Wimer v. Wimer,* 82 Va. 890, 3 Am. St. Rep. 126, it is said, speaking of cases under the general rule: "But even as to these cases it must be borne in mind that the decrees of the foreign court do not directly affect the land, but operate upon the person of the defendant, and compel him to execute the conveyance, and it is the conveyance which has the effect, and not the decree." Citing *Davis v. Headley,* 22 N. J. Eq. 115; 4 Minor, Institutes, pt. 2, p. 1,201.

In *Lindley v. O'Reilly,* 50 N. J. Law, 636, 7 Am. St. Rep. 803, it is said: "The principle upon which this jurisdiction rests is, that chancery, acting *in personam* and not *in rem,* holds the conscience of the parties bound without regard to the *situs* of the property. It is a jurisdiction which arises when a special equity can be shown which forms a ground for compelling a party to convey or release, or for restraining him from asserting a title or right in lands so situated, and is strictly limited to those cases in which the relief decreed can be obtained through the

12

party's personal obedience. * * * The decree in a suit of this aspect imposes a mere personal obligation, enforceable by injunction, attachment or like process, against the person, and cannot operate *ex proprio vigore* upon lands in another jurisdiction to create, transfer or vest a title." *Carpenter v. Strange,* 141 U. S. 87; *Bullock v. Bullock,* 52 N. J. Eq. 561; Story, Conflict of Laws (8th ed.), sec. 543; 1 Wharton, Conflict of Laws (3d ed.), secs. 288, 289; *Watkins v. Holman,* 16 Pet. (U. S.) *25; *Northern I. R. Co. v. Michigan C. R. Co.,* 15 How. (U. S.) 233; *Davis v. Headley,* 22 N. J. Eq. 115; *Miller v. Birdsong,* 7 Bax. (Tenn.) 531; *Gardner v. Ogden,* 22 N. Y. 327; *Hayden v. Yale,* 45 La. Ann. 362, 40 Am. St. Rep. 232; *Allen v. Buchanan,* 97 Ala. 399, 38 Am. St. Rep. 187; *Langdon v. Sherwood,* 124 U. S. 74; *Clarke's Appeal,* 70 Conn. 195, affirmed *Clarke v. Clarke,* 178 U. S. 186; note to *Proctor v. Proctor,* 69 L. R. A. 673 (215 Ill. 275); *Short v. Galway,* 83 Ky. 501, 4 Am. St. Rep. 168.

The case of *Bullock v. Bullock, supra,* deserves special examination. In this case the complainant's husband had been adjudged by the supreme court of the state of New York, in a divorce proceeding of which it had jurisdiction, to execute a mortgage upon lands in New Jersey to secure the payment of a certain sum per month to the complainant as alimony. He refused to do so, and made other mortgages and conveyances of the lands, which the wife alleged were fraudulently made for the purpose of defeating her rights. She charged that she had acquired an equitable lien in the lands by virtue of the New York decree, and prayed the court to set aside the several mortgages and conveyances, and that he be decreed to execute and deliver the mortgage required by the New York court. It will be seen, therefore, that the case was similar to the one at bar, but it was stronger in this respect, that personal service was had upon the respondent in New Jersey in the action to enforce the decree, while in this case, no personal service has been had upon E. W. Fall. The majority of the court held that, while the New York court

might have enforced the execution of the mortgage by the defendant while he was within its jurisdiction, this not having been done, the New York decree could not operate as a cause of action affecting the title to land in New Jersey, and it is pointed out that "the doctrine that jurisdiction respecting lands in a foreign state is not *in rem,* but one *in personam* is bereft of ‘all practical force if the decree *in personam* is conclusive and must be enforced by the courts of the *situs,*" and that such a doctrine would result in practically depriving a state of that exclusive control over its real estate which has always been accorded. Justice Garrison concurred upon the ground that the decretal order was only ancillary to the divorce suit, and "did not possess any element of a judgment upon the issue submitted to the court of decision, which was whether the marriage between the parties should be dissolved." Justice Van Syckel, in a dissenting opinion, said that the New York judgment was conclusive as to the right of the wife to have him execute a mortgage on the New Jersey land, and that, since the courts of New Jersey *would have afforded such relief if the action had been brought in that state,* the judgment imposed an obligation upon the husband which could be enforced in New Jersey by the intervention of a court of equity there. In this connection, however, he says: "The question is whether our court of equity will establish a lien upon the New Jersey land so as to give effect to the New York decree. It may be conceded that the *lex fori* must apply to the remedy to enforce the New York judgment in our courts. *Harker v. Brink,* 4 Zab. (N. J. Law) 333; *Garr v. Stokes,* 1 Harr. (N. J. Law) 404; *Armour v. McMichael,* 7 Vr. (N. J. Law) 92; While we will give full faith and credit to the New York judgment, we cannot be asked to give greater efficacy to a decree for alimony made in New York than we can give to a like decree made in our own courts. For instance, if the common law prevailed here we would enforce the New York decree for alimony only according to the common law practice, for that would exhaust our powers in that

respect. * * * It being competent for our courts to enforce such a decree made in our own courts by establishing it as a lien on lands, we cannot refuse like relief in this case on the extraterritorial judgment. *Huntington v. Attrill,* 146 U. S. 657; *McElmoyle v. Cohen,* 13 Pet. (U. S.) *312." It will be seen, therefore, that neither the opinion of the majority or of the minority of the New Jersey court in *Bullock v. Bullock, supra,* would warrant the ·granting of the relief sought in this case, since the appellee is asking the court to give effect to a decree of the Washington court which it would not enforce if it had been rendered in a court of this state, and that, if the view expressed by Justice Garrison is correct, as to which we express no opinion, the decree adjudging the land to Mrs. Fall is only of the nature of a decretal order, ancillary to the subject matter of the suit, which was the matrimonial status, and is not such a judgment as is entitled to full faith and credit under the constitution and laws of the United States. From a consideration of these authorities, and upon principle, it seems clear that a decree of a court of chancery in a foreign state acting upon a person within its jurisdiction and directing him to make a conveyance of lands in this state in nowise affects the title to the land. The decree and order acts only upon the person, and, if obedience to its mandate is refused, it can only be enforced by the means which have from time immemorial been the weapons of a court of chancery. To say that the decree binds the conscience of the party, so that persons to whom he may convey the land thereafter take no title, is the same as saying that the decree affects the title, which is beyond the power of the courts of another state to do. The transfer and devolution of title to real estate within the limits of a state is entirely subject to the laws of that state and no interference with it can be permitted by other states. *Watts v. Waddle,* 6 Pet. (U. S.) *389; *Davis v. Headley,* 22 N. J. Eq. 115; *Clarke v. Clarke,* 178 U. S. 186; *Wimer v. Wimer, supra; Bowdle v. Jencks,* 18 S. Dak. 80; *Manton v. Seiberling,* 107 Ia. 534. The law will not per-

mit that to be done indirectly which cannot be done directly, and, if the courts of other states can so adjudicate the rights of parties to land in this state that a title apparently clear upon the official records could be made null and void by its action "upon the conscience" of the holder of the legal title, the recording acts of this state would cease to afford protection to purchasers of land, and thus the title in fact be affected, and the power of the state over the transfer and devolution of lands interfered with.

If the Washington decree bound the conscience of E. W. Fall, so that when he left the jurisdiction of that state any deed that he might make would be absolutely void, and had he sold the land to an innocent purchaser, who had inspected the records and found that he was the owner in fee of an undivided one-half interest to the premises, such purchaser, though relying on the laws of this state for his protection, would receive no title. This is the contention of the appellee, carried to its ultimate conclusion, and, if this is correct, the action of the court of another state directly interferes with the operation of the laws of this state over lands within its sovereignty.

Under the laws of this state the courts have no power or jurisdiction in a divorce proceeding, except as derived from the statute providing for such actions, and in such an action have no power or jurisdiction to divide or apportion the real estate of the parties. *Nygren v. Nygren,* 42 Neb. 408; *Brotherton v. Brotherton,* 14 Neb. 186; *Cizek v. Cizek,* 69 Neb. 800; *Aldrich v. Steen,* 71 Neb. 33, 57. In the *Cizek* case, Cizek brought an action for divorce, and his wife filed a cross-bill and asked for alimony. The court dismissed the husband's bill, found in favor of the wife and, by a stipulation of the parties, set off to the wife the homestead, and ordered her to execute to the husband a mortgage thereon, thus endeavoring to make an equitable division of the property. Afterwards, in a contest arising between the parties as to the right of possession of the property, the decree was pleaded as a source of title in the wife, but it was held that that portion of the decree which

set off the homestead to the wife was absolutely void and subject to collateral attack, for the reason that no jurisdiction was given to the district court in a divorce proceeding to award the husband's real estate to the wife in fee as alimony. The courts of this state in divorce proceedings must look for their authority to the statute, and, so far as they attempt to act in excess of the powers therein granted, their action is void and subject to collateral attack. A judgment or decree of the nature of the Washington decree, so far as affects the real estate, if rendered by the courts of this state, would be void.

Is it our duty to give effect to this decree under the full faith and credit clause of the constitution of the United States? "These provisions of the constitution and laws of the United States are necessarily to be read in the light of some established principles, which they were not intended to overthrow. They give no effect to judgments of a court which had no jurisdiction of the subject matter or of the parties, * * * and they confer no new jurisdiction on the courts of any state; * * * nor do these provisions put the judgments of other states upon the footing of domestic judgments, to be enforced by execution; but they leave the manner in which they may be enforced to the law of the state in which they are sued on, pleaded, or offered in evidence." *Huntington v. Attrill*, 146 U. S. 657. The provision of the constitution establishes a rule of evidence rather than of jurisdiction. *Weaver v. Cressman*, 21 Neb. 675; *Hanley v. Donoghue*, 116 U. S. 1, 6 Sup. Ct. Rep. 242; *State of Wisconsin v. Pelican Ins. Co.*, 127 U. S. 265. We know of no rule which compels us to give to a decree of the courts of Washington a force and effect we would deny to a decree of our own courts upon the same cause of action. We must accord full faith and credit to the divorce decree since the Washington court had jurisdiction to render it, but we are not compelled to recognize a decree affecting the title of E. W. Fall and his grantees in an action where he is not in court by personal service, and where the act directed by the Washington court is in opposition to

the public policy of this state, in relation to the enforcement of the duty of marital support. *Anglo-American Provision Co. v. Davis,* 191 U. S. 373, 24 Sup. Ct. Rep. 92; *State of Wisconsin v. Pelican Ins. Co., supra; Lynde v. Lynde,* 181 U. S. 183, 21 Sup. Ct. Rep. 555; *McElmoyle v. Cohen,* 13 Pet. U. S. *312; *Bullock v. Bullock,* 51 N. J. Eq. 444; *Andrews v. Andrews,* 188 U. S. 14. In order to vest Mrs. Fall with any right, title or interest in and to her husband's land in Nebraska by virtue of the Washington decree, it was absolutely necessary that the decree be carried into effect by that court by compelling a conveyance from her husband. Neither the decree nor the commissioner's deed conferred any right or title upon her. The decree is inoperative to affect the title to the Nebraska land, and is given no binding force or effect, so far as the courts of this state are concerned, by the provisions of the constitution of the United States with reference to full faith and credit. Since the decree upon which the plaintiff bases her right to recover did not affect the title to the land, it remained in E. W. Fall until divested by operation of law or by his voluntary act. He has parted with it to Elizabeth Eastin, and whether any consideration was ever paid for it or not is immaterial so far as the plaintiff is concerned, for she is in no position to question the transaction, whatever a creditor of Fall might be able to do. In whatever manner the result of our conclusion may affect the parties to this controversy, it is our duty to sustain the rights of the state to sovereignty over the land within its borders, and to resist an attempt to convey and set apart real estate in Nebraska by the court of another state, when not acting upon and through the person of the owner when under its jurisdiction and by virtue of the proper powers of a court of chancery.

It appears that Mrs. Fall has paid taxes and interest and made other outlays for the benefit of the property, for which she should be reimbursed. The former judgment of this court is vacated and the cause reversed and

remanded to the district court, with directions to proceed in accordance with this opinion, and, if plaintiff so desires, to take an accounting of the rents and profits and disbursements, and to render such decree as may be equitable.

REVERSED.

SEDGWICK, C. J., dissenting.

The fundamental question in this case, the question upon which all others depend, is whether by the law of this state a wife has an equity in the land of her husband during coverture? This question is briefly disposed of in the former opinion, *ante*, p. 104, and it is there considered that she has such equity. The meaning of the court, however, as expressed in the former opinion upon this point, has been substantially overlooked or entirely misunderstood. It is therefore thought advisable to discuss the question more at large. In this state the amount given to the wife in a decree of divorce is generally called alimony. This term is derived from a Latin word which primarily meant to nourish, that is, to supply the necessities of life. It was introduced into divorce proceedings by the early ecclesiastical courts of England, and in the early practice of those courts it was defined to be "that support which the husband, on separation, is bound to provide for the wife, and is measured by the wants of the wife, and the circumstances and the ability of the husband to pay." After stating this definition the supreme court of Illinois, in *Cole v. Cole*, 142 Ill. 19, 27, proceeded as follows:

"The duty of the husband to support and maintain the wife in a manner befitting his condition and circumstances in life still continues; but the foregoing definition may fall far short of what is termed alimony in our statute, and, indeed, in all those jurisdictions where divorces are granted *avinculo matrimonii*. It will require no discussion or citation of authority to establish that the husband owes the wife who by his fault has been driven to seek a

permanent separation, not only reasonable support and maintenance, but also that she shall be put in no worse condition by reason of the marriage, the dissolution of which has been caused by his wilful misconduct. Equity and good conscience require that the husband shall not profit by his own wrong, and that restitution shall be made to the wife of the property which she brought to the husband, or a suitable sum in lieu thereof be allowed out of his estate, so far as may be done consistently with the preservation of the rights of each, and also that a fair division shall be made, taking into consideration the relative wants, circumstances and necessities of each, of the property accumulated by their joint efforts and savings. The policy of the law should be, and is, to do justice, and to give to the injured wife not merely what necessity but what justice demands."

Alimony, in its primary sense, may be allowed the wife although neither party has any property whatever. If the husband is competent to earn a living for himself and wife he is, by the fact of his marriage, required by our law to furnish such support to the wife, and, again, if upon the consummation of the marriage there is a separation, and the wife neither brought any property to the husband nor contributed in any manner toward the accumulation of property, still the husband is bound to furnish suitable support for the wife. Under such circumstances as these, the term alimony is used in its original meaning and signification. In the progress and development of our law governing the domestic relations, the word alimony has come to be used with a far different meaning. When the property that the wife had at the time of her marriage is combined with the property of her husband and accumulations are afterwards added, or when neither had property at the time of the marriage and by their united efforts and economies property is accumulated, to say that, because the title to that property is taken in the name of one party, the other party has no equitable rights therein, would be a monstrous per-

version of modern ideas of justice and equity. In the case just cited, the Illinois court said:

"The husband and wife are placed upon an equal footing in respect to the interest each may have in the estate and property of the other, and husband and wife may contract with each other, and she with strangers, as if she were sole. In case of divorce the courts look at the standing of the parties, the conduct of each, and from whence the estate is derived, and, having due regard to the living of each, will make such allowance to the wife as is reasonable and just.   *   *   *   And the same is undoubtedly true where the property has been accumulated by the joint effort and economy of the husband, and wife, and the allowance has been made to her upon the basis of a reasonable and equitable division of the estate. It may be true that the husband, in such cases, has been the apparently efficient means of its accumulation; yet if she has performed her duties as his wife faithfully, giving him her life, her care, strength and prudent management, it can no more be said that the estate is the result of his labor than it is of her labor. * * * For aught that appears in this petition the entire property of the petitioner may have come from the wife, or been the result of their joint earnings and accumulations, and the court, in making the allowance, may have been making simple restitution, either for property brought to the husband or for assistance in its accumulation."

It has frequently been held by this court that, in the allowance of permanent alimony, the court should consider whether the wife contributed anything to the common fund. *Zimmerman v. Zimmerman*, 59 Neb. 80. If she is entitled only to support and maintenance, the amount would depend upon her necessities and upon her husband's ability. If the amount that she has contributed toward the accumulation of the property is to be taken into consideration, it is because she has an equitable interest in the property which they together have earned and paid for. Our statute provides a method for enforce-

ing this right of the wife in the property which is in the name of the husband. The court must ascertain from the evidence what amount she has contributed toward it, either in property or by her individual efforts, and must decree that amount in her favor. This decree at once becomes a lien upon the property. The husband cannot, after this decree is entered, convey the property so as to avoid payment according to its terms. He cannot convey the property before the decree, and while they are living together as husband and wife, with the purpose and effect of defrauding the wife of her interest in the property. *Roehl v. Roehl,* 20 Neb. 55. In that case the conveyance was made long before the decree of divorce and alimony. It could not therefore be held to have been made to defraud creditors. The wife was not a creditor of the husband at the time the conveyance was made. The conveyance was set aside because it was in fraud of the wife's equitable interest in the property which arose from the marital relations. Our statute provides that the remedy which it specifically gives the wife to enforce her interests in the husband's property shall not be exclusive. By chapter 40, laws, 1883, it was enacted: "Section 1. All judgments and orders for payment of alimony or of maintenance in actions of divorce or maintenance shall be liens upon property in like manner as in other actions, and may in the same manner be enforced and collected by execution and proceedings in aid thereof, or other action or process as other judgments. Section 2. The remedy given by this act shall be held to be cumulative and in no respect to take away or abridge any subsisting remedy or power of the court for the enforcement of such judgments and orders. *Provided,* Nothing in this act shall affect the title of any *bona fide* purchaser for value holding by reason of such *bona fide* purchase at the date of its passage." There are no exemptions under this statute. All property that stands in the name of the husband is absolutely liable to the full extent of any interest that the husband may have at the time of the decree, and by chapter 41,

enacted in the same year, it is. provided that: "In all cases where alimony or other allowance shall be decreed for the wife or for the children, the court may require sufficient security to be given by the husband for the payment thereof, according to the terms of the decree," and it is further provided that, if security is not given, a receiver shall be appointed to take charge of both real and personal property; and the provisions of the first section of chapter 40, which was approved on the preceding day, are reenacted.

A judgment in favor of the wife, to be determined by a consideration of the amount which she has contributed toward accumulation of the common property of the family, has no other basis or foundation than her equitable rights in the property which she has so helped to accumulate. Unless she has an equity in such property to be in some manner enforced, such judgment is wholly arbitrary and unsupported. It is not based upon contract. It is not compensation for wrongs which she has suffered. It is because our statute has provided for the enforcement of this right by judgment, and lien, and execution, and receivership, and compulsory security, if necessary, and because it expressly provides that the court, in an action for divorce, may transfer the title of personal property from the husband to the wife, that this court has established the doctrine that this remedy, as so provided, is exclusive, and that the court cannot directly transfer the legal title in land from the husband to the wife to satisfy her equities in the land. Whether this conclusion of the court was just or is necessary, we are not required now to consider; but it is manifest, from the provision of the statute and from the decisions of the court, that this construction of the statute relates only to the remedy, and not in any respect to the fundamental rights of the wife. Without doubt the law of Nebraska recognizes the equitable right of the wife in the property which she brought to the family at the time of her marriage, or to the accumulation of which she has contributed. It will be

remembered that in this case the trial court found that at the time this husband and wife came to Nebraska they were without means; that this land in controversy was purchased and paid for by their joint efforts and contribution. Afterwards, and after they had owned this land for some time, they removed to the state of Washington. The marriage status was within the jurisdiction of the Washington court. When they removed from Nebraska they had, as husband and wife, mutual equities in this land in question. These equities were personal rights and went with their persons to the state of Washington. The courts of the state of Washington therefore had jurisdiction both of the marriage status and of the equities existing between the parties in this land.

2. It is said that it is against the public policy of this state to transfer the lands of the husband directly to the wife in a divorce proceeding. Courts have been accused of appealing to public policy in justification of acts or omissions on their part, which could not in fact be justified. Can public policy be interested in forms of procedure? Is there any principle of morality or public policy involved in determining what instrumentalities shall be used to give a wife her equitable share of the common property? When a divorce is granted her, the public policy of this state is to consider what property she brought to the family, and how much her individual efforts, her care, prudence and economy have contributed to the accumulation of the property, whether that property at the time of their separation is held in her name or in the name of her husband, or in both their names jointly. When those rights and equities of the wife are determined, the policy of our law is to see that she gets her equitable share of the property. There is no charm of public policy in the method by which it is brought about. When the husband and wife go to another state and there make their home, their rights and equities go with them, though their property is left here. The relations between them are no less intimate, and their equitable rights in the joint

property are no less palpable and certain than are those of ordinary business copartners, and when the marital partnership between them is terminated the public policy of this state, and of all other civilized states, demands that the court that dissolves that relation should adjust their property rights, and determine what the wife is entitled to out of their joint property. In Washington the court does this by directly determining the just and equitable interest that each has in the joint property, and not by the circuitous process of a judgment, lien and sale —a procedure which we have introduced by a doubtful construction of our statutes, but which is supposed to bring about the same result. No court would hesitate to hold that, in a judgment of dissolution of ordinary partnerships, the court should determine the rights of the several partners in the joint property, and that, if the court has jurisdiction of the persons of the partners, its judgment fixing their equities may be used as a basis of right wherever the property may be situated. It is not doubted that, so far as the marriage status is concerned, and the equitable rights of the parties properly before the court, the judgment of the court thereon would be final and binding everywhere.

If the husband had agreed to sell and convey this property to the wife, and she had paid him therefor, and he had still retained the legal title, and their equities under this contract had been submitted to the court by proper pleadings and evidence in the divorce case, a question of the proper joinder of causes of action might possibly have arisen, but there would have been no question of the jurisdiction of the court over either cause of action. Whether they could be determined together would be a mere question of practice, in which no other court would be interested. If the trial court upon such an issue had determined that the wife had fully paid for the land, and was in equity the owner thereof, that determination would be binding everywhere, and, while it would not operate directly upon the land, and would not change the legal

title, still the husband could never be heard to deny in any court that the wife had paid him in full for the land, and was in equity and common justice the owner thereof. In this case she has paid him for the land by becoming his wife, and by contributing to the accumulation of a common property of which he has had his full equitable part. He has agreed to convey it to her, because the law implies that agreement from his marriage and separation from her under the circumstances. The equities so arising are as strong and as capable of litigation and adjudication as are the equities created by a written contract of partnership, or a contract of purchase and sale of land. Such equities may be adjudicated by any court of general equity jurisdiction, when the parties and the conditions or relations out of which they arise are properly before the court. Under our statute these equities of the wife are valued, and by decree and lien are taken from the property in the husband's name.

3. Another important feature of the case, and which is also a matter of preliminary character, appears to have been misunderstood. Much is said in the briefs in regard to an action to quiet title, and the rule of law that a party to maintain an action to quiet a title must have some title to quiet. Authorities are cited upon this proposition and the discussion is gone into much at large, and so the real question presented here is overlooked. The plaintiff in her petition sets out her marriage and residence in Nebraska, the acquisition of this property where they resided in Nebraska, her contributions to the accumulation of the property, the fact of their removal to the state of Washington and becoming residents of that state, the divorce proceedings there, and the fact that the equities of the respective parties in the land were by both parties submitted to the court, and the trial and judgment there, and other matters tending to support her right, and then asks that equity may be done her. She also asks that her title be quieted. This, then, is an action in equity by the plaintiff to have her interest, her right, her equity in the

land determined, adjudicated and quieted. To say that she cannot maintain an action to fix her interest in the land and to establish her title thereto, because she has no title, appears to be an attempt at mockery. She alleges facts which she claims entitle her to an interest in the land and to relief at the hands of the courts of Nebraska, and the question is whether these facts entitle her to any relief.

4. Another matter that has confused the argument in this case is the indefinite use of the word "title." It is shown in 8 Words and Phrases, 6979, that this word is used in connection with property in some thirty odd different shades of meaning, and it is said by the supreme court of Illinois, in *Irving v. Brownell,* 11 Ill. 402, 415:

"There are perfect titles and apparent or imperfect titles. Even a naked possession constitutes a species of title, though it may be the lowest degree. The meaning of the word is, therefore, to be ascertained from the connection in which it is used."

It is sometimes, and perhaps quite commonly, used in the signification of a regular chain of transfer from or under the sovereignty of the soil. It is sometimes used in the sense of the particular conveyance under which a man holds his property. In either of these senses of the word, the courts of one state cannot in any manner affect the title to lands of another. But the word title in connection with interests in land has been carelessly used in various opinions of courts, as well as in the opinion now promulgated in this case. For instance, the note of Judge Freeman to *Newton v. Bronson,* 67 Am. Dec. 89 (13 N. Y. 587) is cited, and an extensive quotation is made therefrom, which ends with the following words:

"The decree of chancery, then, with respect to realty beyond its jurisdiction, can have no direct operation upon the property, and *per se* in no way affect the legal or equitable title thereto."

A subsequent sentence in the same paragraph of the note is not quoted. It is as follows:

"Still a decree concerning a conveyance is not without its effect *per se*. Thus a decree directing a conveyance may be pleaded as a cause of action or defense in the courts of the state where the land is situated, and it is entitled in such a court to the force and effect of record evidence of the equities therein determined, unless it be impeached for fraud."

If this statement had also been quoted, it would have been necessary to have considered what was meant by the words "equitable title" in the first quotation. It may be that the words were not used by the learned author with entire accuracy, but he certainly did not mean thereby "equitable right to any interest in the land." Of course, in an action, whether at law or in equity, the decree of the court of another state cannot be considered to create a title to lands in this state. No one with such a decree can maintain a possessory action thereon; but, with such a decree, he can say to his opponent you will not be allowed to dispute the facts that are established by this decree. The distinction is analogous to that which is made in the application of the law of *res adjudicata*. A judgment in an action of forcible entry and detainer, whether obtained before a justice of the peace or upon appeal to a court of general jurisdiction, is not a bar to any other action between the same parties in regard to the same land. But any controversy of fact which was properly in issue before the justice, and within his jurisdiction, and contested by the parties, and determined by the judgment of the justice, is settled by his judgment, and that question of fact, so settled, cannot afterwards be disputed by either of those parties in litigation concerning the same land. And so, in determining the effect of a judgment of courts of a sister state in controversies in regard to real estate in this state, it is uniformly held that such judgment cannot be relied upon as title; that it does not affect the title nor in any way act directly upon the land. But questions of fact that were in litigation before the foreign court, and were within the juris-

13

diction of that court to determine, and were settled by the judgment of the court, ought not again to be litigated by the parties, and either party may rely upon such adjudication as finally settling such questions of fact. If, in such litigation in the sister state, it was alleged and proved that, by virtue of an existing contract between the parties, there was a controversy as to their equitable rights in real estate situated within this state, or if it was alleged and proved that, by reason of fraudulent practices on the part of one of the parties, equities existed in the other in real estate in this state, and the issues so presented were tried and determined, we are required by the comity which exists between the states, as well as by the express provisions of the federal law, to give full faith and credit to such determination. In this case the wife had an equity in this land, because she had assisted her husband to accumulate the means with which it was paid for, and because he, by his treatment of her, made their separation and the separation of their rights and equities necessary. These questions were submitted to, and determined by the Washington court.

It is said that "not a single case" has been found, in which the direct question at issue was whether a decree "affecting the title to real estate lying in another state will be recognized in the state in which the land lies, where no conveyance has been made in obedience to the decree, and where the title has been conveyed to third parties." This appears to overlook the question presented here. No court of England or America has held that the decree of the courts of one state can affect the legal title or "chain of title"—that is, the title, as the word is commonly used—of lands in another state. It is always held that only the courts of the state where the land lies can adjudicate land titles. If this were not so, the plaintiff might record a copy of her decree and complete her title thereby. Neither has any court held that the decree of a court of another state would affect the rights of third parties, who were innocent purchasers of the land. When,

however, issues are presented to a court of competent jurisdiction, and the court, having jurisdiction of the parties and of the issues so presented, determines such issues, and the equitable rights of the parties in lands in another state depend upon the facts so determined, that determination of the equities of the parties may be relied upon in any litigation that may arise between the same parties, and full faith and credit must be given to such adjudication of the rights of the parties. In any event, third parties who purchase from the apparent owner are not affected by outstanding equities in the land. In this respect it will make no difference whether or not those equities have been adjudicated. If the purchaser is charged with actual or constructive notice of those equities at the time of his purchase, he takes the land subject to those equities, whatever they may be, whether adjudicated or not. In the former opinion it was pointed out that the defendant who claims through Mr. Fall had constructive notice of Mrs. Fall's equities in the land. The land was occupied by a tenant, who recognized Mrs. Fall as his landlord and attorned to her, to the exclusion of all other claims to the land. This was notice to a subsequent purchaser. These facts appear to fully answer the statement that, "To say that the decree binds the conscience of the party, so that persons to whom he may convey the land thereafter take no title, is the same as saying that the decree affects the title." The determination of the Washington court upon the facts there in issue so far binds the conscience of the parties that third parties, who know that the conscience of the parties is so bound, ought not to buy the land and pay the purchase price to the wrong person. It is conceded that the Washington court might have compelled obedience to its decree. It might have, by imprisonment, enforced the execution of a deed, but it is said: "The decree and order acts only upon the person, and, if obedience to its mandate is refused, it can only be enforced by the means which have from time immemorial been the weapons of a court

of chancery." Again, the authorities from which this
thought is derived have been misunderstood, as it appears
to me. The court which enters the decree can only en-
force it by acting upon the person, and that is all of the
meaning of these authorities. The decree is binding upon
the conscience of the parties. In what sense is it bind-
ing upon the conscience? Would the conscience be re-
leased from obligations of this decree as soon as they
crossed the state line? If their consciences are affected
and bound by the decree it would seem that they would
be so bound until they complied with the decree. If liti-
gants come before the courts of equity of this state and
concede that they are in conscience bound to acknowledge
the rights and interest of their adversary in the matter
in dispute, what is the duty of the court of equity? It
is for no other purpose that courts of equity are estab-
lished. It is to compel litigants to do what they are in
conscience bound to do. And so here, if Mr. Fall is in
conscience bound to transfer the legal title of this land
to Mrs. Fall, and if his grantees knew when they took
their title from him that he was in conscience bound so
to do, and these parties are before a court of equity in
this state, the power and duty of the court are clear.
I do not understand the application of the following
language: "If the Washington decree bound the con-
science of E. W. Fall, so that when he left the jurisdic-
tion of that state any deed that he might make would be
absolutely void, and had he sold the land to an innocent
purchaser, who had inspected the records and found that
he was the owner in fee of an undivided one-half interest
to the premises, such purchaser, though relying on the
laws of this state for his protection, would receive no
title. This is the contention of the appellee, carried to
its ultimate conclusion." We have already shown that
there is no such question in this case. If Mr. Fall had
been bound by contract or in any other way to recognize
the equities of Mrs. Fall in this land, it would not be
true that "any deed that he might make would be abso-

lutely void." The binding force of such contract upon his conscience would be no greater and no less than the decree in question. It establishes beyond further controversy that there are existing facts by virtue of which Mrs. Fall is in equity entitled to this land. In order to preserve these equities, it was her duty to act at once as soon as she knew there was danger that Mr. Fall would attempt to sell the land to an innocent purchaser. This she did by taking notorious possession of the land and commencing her action in the courts of this state to establish her rights in the land. If there are innocent purchasers of the land, their rights should, of course, be protected, and it seems strange that it should be supposed that there is doubt upon that proposition.

The case of *Bullock v. Bullock*, 52 N. J. Eq. 561, was somewhat discussed in the former opinion. In addition to what was there said, it may be suggested that the question there in controversy was whether the New York decree dealt with equities in the land. The New York court first entered a judgment against the defendant, and then directed that the judgment should be secured by transferring the title of the land in New Jersey by way of mortgage to the plaintiff as security for her judgment. It attempted to act directly upon her title to the land, and, while some of the judges thought it ought to be construed as a determination that she had an equity in the land, the majority of the court thought otherwise, holding that the decree did not purport to establish an equity in the land, but only to require the defendant to transfer the title as security, and, as the courts of New York cannot operate directly upon titles to lands in New Jersey, it was held that the decree was inoperative. If the New Jersey court had been convinced that the question before the New York court was whether or not the plaintiff had some equity in the New Jersey land, and that the New York court had decided that, by virtue of their former relations and transactions between them, there were existing equities in the land in favor of the plaintiff, there

can be no doubt from the various opinions filed in the
case that all of the judges would have agreed that such
decree would be binding upon the conscience of the parties
and would everywhere estop them to deny the existing
equities of the plaintiff.   It is said in the opinion: "If
Fall had obeyed the order of the Washington court and
made a deed of conveyance to his wife of the Nebraska
land, even under the threat of contempt proceedings, or
after duress by imprisonment, the title thereby conveyed
to Mrs. Fall would have been of equal weight and dignity
with that which he himself possessed at the time of the
execution of the deed."   The validity of such a convey-
ance to transfer the land would depend upon the same
considerations that would determine the validity of the
decree itself to fix the equities in the land in such manner
as to be binding upon courts of other states.

If the Washington court had no jurisdiction of the
equities of the parties, a deed procured by threats of con-
tempt proceedings under the decree of the Washington
court, and by imprisonment, would have no more validity
in this state than would any other deed procured by
duress and threats.   But if, on the other hand, the Wash-
ington court had jurisdiction of the equities of the parties
and the question of those equities was properly presented,
the decree of that court thereon would be a sufficient basis
for contempt proceedings in that court to compel the
execution of a deed, and, for the same reason and to the
same extent, it would be a sufficient basis in litigation in
all other courts to estop the defendant to deny the equi-
table rights of the plaintiff so fixed.   It is a general rule
with courts of equity that they will not assume jurisdic-
tion unless the circumstances are such that they can
enforce their decree, and so, unless the party is before
the court so that he can be compelled by its process to
perform the decree, a court of equity will not assume
jurisdiction of the equities of the parties in land situated
in another state.   This principle has been construed in
the opinion to mean that, in case the court, believing that

it can enforce its decree, assumes jurisdiction, tries the issue and enters the decree, that decree will be of no force as settling the equities of the parties, if the party can evade the process of the court so that the same court cannot compel a conveyance. Such reasoning, it seems to me, calls for no discussion.

The following language is quoted in the opinion from the supreme court of Virginia in *Wimer v. Wimer*, 82 **Va.** 890.

"But even as to these cases it must be borne in mind that the decrees of the foreign court do not directly affect the land, but operate upon the person of the defendant, and compel him to execute the conveyance, and it is the conveyance which has the effect, and not the decree."

Why does this court and all other courts use the word "directly" in this statement of the law? If the decrees of the foreign court do not in any way affect rights in the land, the expression would be much more simple and emphatic if the word "directly" were omitted. That case was an action in partition, and language of Judge Story is also quoted in the majority opinion in regard to the jurisdiction of the court in one state to partition lands in another state, and it seems to be thought that such authorities have a bearing upon the question presented here. An action in partition is an action in regard to the legal title. An equitable right to land will not support an action in partition at all. Both parties must have the legal title in common, and, when they do so hold the legal title, either has the right to have that title severed and the land divided. If the parties have equitable rights in the land these must be settled and adjudicated in another action before partition can be had. Equitable rights are personal rights and may be adjudicated where the parties are, but the legal title can only be severed and the land apportioned where the land is. This is a sufficient reason for holding that the courts of one state cannot partition the title to lands in another state. The decrees of a foreign court cannot directly affect the land,

but as is everywhere determined, and as is said by Mr. Justice Brewer in *Dull v. Blackman,* 169 U. S. 243, cited in the former opinion:

"If all the parties interested in the land were brought personally before a court of another state, its decree would be conclusive upon them and thus in effect determine the title."

This is the statement of a principle so commonly known and so generally determined by the courts that it called for no discussion by the learned judge who used it, and yet this statement of the law and the statement of the same court in *Cheever v. Wilson,* 9 Wall. (U. S.) 108, are spoken of in the opinion as *dicta* merely and are lightly turned aside as of no importance. The case of *Cizek v. Cizek,* 69 Neb. 800, is cited as authority in the case at bar. In the first opinion of this court in that case, written by Mr. Commissioner POUND, it was said: "In case the pleadings are sufficient to bring the subject matter before the court, the decree may not be attacked collaterally merely for want of findings."

This proposition is reaffirmed in the last opinion as "sound," but it is considered that the pleadings did not present the issue of an equitable interest of the wife in the real estate in question, and, as no such issue was presented by the pleadings, it was held that the court was without jurisdiction to determine it. In the case at bar the issue of the wife's equity in the land was presented and the Washington court had undoubted jurisdiction to determine that issue.

It seems clear that when they lived in Nebraska the wife had an interest in equity in this land; and she did not lose her interest when they removed to Washington. When their separation became necessary from the conduct of her husband, the law, both of this state and of Washington, required that she be given her rights in the land. These rights were necessarily and properly submitted to the court. The court had jurisdiction to determine these rights and did determine them. This decision was then,

and still continues to be, binding upon the conscience of Mr. Fall, so that he cannot anywhere, in any court, be allowed to say that such right does not exist. These rights of Mrs. Fall would not prevent Mr. Fall from conveying the land to an innocent purchaser in good faith who took the conveyance without notice, but a purchaser from Mr. Fall, with notice of the rights of Mrs. Fall, would take the land subject to those rights, and this would be so whether the rights had been adjudicated or not. Mr. Fall, having fraudulently transferred the legal title to another, is not a necessary party to this action; his grantee with notice holding the legal title from him is a necessary party, and the same relief can be granted to plaintiff as could be granted against Mr. Fall, if he still held the title.

The former judgment is right and should be adhered to.